(113 P.3d 822)
No. 92,143

Norman Goodman, *Appellant,* v. State of Kansas Department of Transportation; E. Dean Carlson, Secretary of Transportation; and State of Kansas Department of Transportation, d/b/a Kansas Operation Lifesaver, *Appellees.*

Opinion filed June 10, 2005.

*Norbert C. Marek, Jr.,* of Myers, Pottroff & Ball, of Manhattan, for appellant.

*Vicky S. Johnson,* of Kansas Department of Transportation, for appellees.

Before MARQUARDT, P.J., ELLIOTT and GREEN, JJ.

MARQUARDT, J.: Norman Goodman appeals the trial court's grant of summary judgment to the Kansas Department of Transportation (KDOT), E. Dean Carlson, the Secretary of KDOT, and KDOT, d/b/a Kansas Operation Lifesaver. We affirm.

On November 23, 1999, a train owned by Union Pacific struck Goodman's vehicle at a railroad grade crossing located in Brown County. Goodman was injured. On November 15, 2001, Goodman filed a lawsuit alleging that Union Pacific and its employees had been negligent in maintaining and operating a train crossing, had engaged in fraudulent behavior by misrepresenting facts as part of its public relations campaign, and had made fraudulent reports. Goodman alleged that KDOT and Carlson were negligent because they breached their duties to administer federal funding in compliance with 23 U.S.C. § 130(d) (2000), 23 U.S.C. §109(e) (2000), 23 C.F.R. § 646.214, and 49 U.S.C. § 20106 (2000), and they also failed to install adequate warning devices at the crossing. Goodman also alleged that Kansas Operation Lifesaver, operated by KDOT, disseminated misinformation about the safety risks involved at train crossings, and those misrepresentations created an increased risk of harm which contributed to his accident.

After Goodman settled with Union Pacific, L.D. Howe, and B.K. Lewis, the remaining defendants, KDOT, Carlson, and KDOT, d/b/a Kansas Operation Lifesaver (hereinafter referred to collectively as KDOT), filed a motion for summary judgment.

On April 2, 2004, the trial court granted summary judgment to KDOT. The trial court found that KDOT had complied with 23 U.S.C. § 130(d), and that 23 U.S.C. § 109(e) and C.F.R. § 646.214 were not applicable to this case. The trial court also found there was no legal basis for Goodman's claim that KDOT was negligent for failing to monitor Union Pacific's activities at the crossing or the claims regarding Operation Lifesaver. Goodman timely appeals.

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Bracken v. Dixon Industries, Inc.*, 272 Kan. 1272, 1274-75, 38 P.3d 679 (2002). On appeal, we apply the same rules, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. *Bergstrom v. Noah*, 266 Kan. 847, 871-72, 974 P.2d 531 (1999). Where there is no factual dispute, appellate review of an order regarding summary judgment is de novo. *Duarte v. DeBruce Grain, Inc.*, 276 Kan. 598, 602, 78 P.3d 428 (2003).

Goodman is pursuing a claim against KDOT for failing to follow 23 C.F.R. § 646.214(b)(3) after expending federal funds at the railroad crossing, and negligence on the theory that KDOT breached a duty which it assumed by reviewing the crossing and slating it for improvements.

23 C.F.R. § 646.214 (b)(3)(I) states, in pertinent part:

*"Adequate warning devices,* under Sec. 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:

(A) Multiple main line railroad tracks.

(B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.

(C) High Speed train operation combined with limited sight distance at either single or multiple track crossings.
(D) A combination of high speeds and moderately high volumes of highway and railroad traffic.
(E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.
(F) A diagnostic team recommends them."

This regulation was adopted by the United States Secretary of Transportation to implement 23 U.S.C. § 130, known as the Federal Railway-Highway Crossings Program. The Crossings Program was created by the Highway Safety Act of 1973. See *Norfolk Southern Railway Co. v. Shanklin*, 529 U.S. 344, 347-349, 146 L. Ed. 2d 374, 120 S. Ct. 1467 (2000).

The question in this case is whether 23 C.F.R. § 646.214(b)(3) and its enabling legislation, 23 U.S.C. § 130, create an implied private right of action. In *Gonzaga Univ. v. Doe*, 536 U.S. 273, 153 L. Ed. 2d 309, 122 S. Ct. 2268 (2002), the United States Supreme Court discussed a number of recent court opinions which had considered the issue of whether Congress intended to create a private right of action under Spending Clause statutes. The Court noted that it had only found spending legislation to give rise to enforceable rights on two occasions since 1981. 536 U.S. at 280.

The *Gonzaga* Court noted that the first step in determining whether a private right of action can be implied from a particular statute is to determine whether Congress intended to create such a right. When a statute by its terms does not grant a private right to any identifiable class, there is no private right of action. 536 U.S. at 283-84. For a statute to create a private right, its text must be written in terms of the persons benefitted. Some examples of text from statutes conferring a federal right are: *"No person* in the United States *shall* . . . be subjected to discrimination . . . . [Citation omitted.]"; *"No person* in the United States *shall,* on the basis of sex, . . . be subjected to discrimination . . . . [Citation omitted.]"* 536 U.S. at 284 n.3.

Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress. *Alexander v. San-*

*doval*, 532 U.S. 275, 286, 149 L. Ed. 2d 517, 121 S. Ct. 1511 (2001). To determine whether a private right of action exists, the statute passed by Congress must be examined to determine whether it displays an intent to create not only a private right, but also a private remedy. Statutory intent is determinative. 532 U.S. at 286. Without statutory intent to create a private remedy, a cause of action does not exist and the courts may not create one regardless of how desirable it may be as a policy matter or how compatible it would be with the statute. 532 U.S. at 286-87. A statute must evince congressional intent to create new rights, it is not enough to look at who would benefit from the statute; the statute must demonstrate intent to confer federal rights on those beneficiaries. *California v. Sierra Club*, 451 U.S. 287, 294, 68 L. Ed. 2d 101, 101 S. Ct. 1775 (1981).

In this case, the enabling statute for 23 C.F.R. § 646.214(b)(3) is 23 U.S.C. § 130, titled "Federal Railway-Highway Crossings Program." *Shanklin*, 529 U.S. at 348.

23 U.S.C. § 130 was intended to help states finance improvements to railway-highway crossings. Although the statute is intended to increase safety, it is not designed to create a federal right for anyone who might be injured at a railway-highway crossing. Furthermore, the purpose of regulations governing railroad-highway projects "is to prescribe policies and procedures for advancing Federal-aid projects involving railroad facilities." 23 C.F.R. § 646.200(a). The standards for implementing grade crossing improvements, including the standards for adequate warning devices, are in 23 C.F.R. § 646.214(b).

Goodman argues that the states are responsible for making improvements and following federal regulations at federally funded crossings. Goodman cites *Ball v. Burns & McDonnell*, 256 Kan. 152, 162, 883 P.2d 756 (1994), for support; however, the issue in *Ball* involved a different subsection of the regulation, 23 C.F.R. § 646.214(b)(2). The *Ball* court stated that unlike § 646.214(b)(3), § 646.214(b)(2) did not create a mandatory duty on the states. 256 Kan. at 161-62. The *Ball* court cited *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 123 L. Ed. 2d 387, 113 S. Ct. 1732 (1993), as authority for the proposition that 23 U.S.C. § 130(d) and 23 C.F.R.

§ 646.214(b)(3) impose a duty on the states. 256 Kan. at 160. However, even if *Shanklin* and *Easterwood* are read as requiring the states to take responsibility for federally funded crossings, it does not mean that motorists like Goodman would be entitled to sue for damages. None of these cases discussed that issue. Furthermore, " '[i]n legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State.' [Citation omitted.]" *Gonzaga*, 536 U.S. at 279-80.

23 U.S.C. § 130 and 23 C.F.R. § 646.214(b)(3) do not demonstrate congressional intent to create a federal right and private remedy for persons injured in railway-highway accidents.

Goodman argues that KDOT assumed a duty to install adequate warning devices at the crossing by reviewing the crossing and slating it for improvements. He argues that once KDOT assumed this duty, it was negligent for failing to make the improvements.

Goodman cites to several Kansas cases, including *Schmeck v. City of Shawnee*, 232 Kan. 11, 26, 651 P.2d 585 (1982), to demonstrate that the Restatement (Second) of Torts §324A (1965) has been applied in Kansas for years. This section of the Restatement reads:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking." Restatement (Second) of Torts § 324A.

We must analyze Goodman's argument to determine whether KDOT assumed a duty to improve the crossing. The assessment of the crossing at issue in this case was part of the 23 U.S.C. §130 corridor project. Section 130 requires states to conduct surveys of

crossings as part of the program; it does not impose on KDOT a duty to motorists simply by surveying the crossing.

Goodman's own account of the accident belies his claim that KDOT's failure to install stop signs and pavement improvements caused his injury. Goodman was familiar with the road, having used the crossing on a weekly basis for several years. On the day of the accident, Goodman slowed to a near stop before reaching the first track and looked for an approaching train. Goodman stated that he did not see or hear the approaching train, though it was less than 100 feet (1.6 seconds) away. The existence of stop signs would not have prevented this accident. Goodman's testimony does not show that KDOT's failure to install stop signs caused his injury.

When construed in a light most favorable to Goodman, the evidence does not establish that KDOT assumed a duty to improve the crossing, or that the failure to implement the improvements caused Goodman's injury. The trial court did not err in granting summary judgment to KDOT.

Affirmed.